Entered on Docket January 29, 2013

**Below is the Order of the Court.**

_____
Karen A. Overstreet
U.S. Bankruptcy Judge
**(Dated as of Entered on Docket date above)**

Karen A. Overstreet
Bankruptcy Judge
United States Courthouse
700 Stewart Street, Suite 6301
Seattle, WA 98101
206-370-5330

IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| In re<br><br>CONSOLIDATED MERIDIAN FUNDS,<br>a/k/a MERIDIAN INVESTORS TRUST, et al.<br><br>Debtors. | Case No. 10-17952 |
| MARK CALVERT, as liquidating Trustee of<br>MERIDIAN INVESTORS TRUST, et al.<br><br>Plaintiffs,<br><br>v.<br><br>FOSTER RADFORD, *et al.*,<br><br>Defendants. | Adv. No. 12-01505<br><br>ORDER DENYING SUMMARY<br>JUDGMENT MOTION OF SUN<br>GRANITE INVESTMENTS LLC |

Order - 1

This matter came before the Court on January 18, 2013, on the motion for summary judgment (the "Motion") filed by Sun Granite Investments LLC ("Sun Granite"). Sun Granite appeared at the hearing by its counsel, Bruce J. Borrus of Ridell Williams P.S., and the plaintiff, Mark Calvert (the "Trustee"), was represented by Philip M. Guess of K&L Gates LLP. The Court heard oral argument at the hearing and has considered the following pleadings:

Motion for Summary Judgment (Dkt. #69);
Declaration of Lemoine Radford in Support of Motion (Dkt. #70);
Declaration of Bruce J. Borrus in Support of Motion (Dkt. #71);
Plaintiff's Response in Opposition to Motion (Dkt. #74);
Declaration of Heidi Garcia in Support of Plaintiff's Response (Dkt. #75);
Declaration of Philip M. Guess in Support of Plaintiff's Request for Continuance Under FRBP 7056 and FRCP 56(d);
Reply of Sun Granite to Trustee's Response to Motion (Dkt. #80);
Supplemental Filing of Exhibit 1 to the Declaration of Bruce J. Borrus (Dkt. #81); and
Notice of Supplemental Authority (Dkt. #83).

**I.  BACKGROUND**

The Trustee contends that this adversary proceeding arises from a massive Ponzi scheme perpetrated by Frederick Darren Berg ("Berg"). Berg is a debtor in his own individual bankruptcy proceeding, along with six other related entities. The Court is presiding over 12 bankruptcy cases involving debtors that are/were investment funds (the "Meridian Funds") and one affiliated entity formerly owned, managed or controlled by Berg. Those debtors have been substantively consolidated into one proceeding referred to hereinafter as the "Meridian Bankruptcy." On June 22, 2011, the Court entered an order confirming a consensual Chapter 11 plan in the Meridian Bankruptcy (the "Plan"). The Plan provides for the creation of the Liquidating Trust for the Substantively Consolidated Meridian Funds, a/k/a/ The Meridian Investors Trust (the "Meridian Investors Trust"). Mark Calvert, the named plaintiff in this adversary proceeding, is acting as the Liquidating Trustee of the Meridian Investors Trust, which holds all of the claims of the consolidated bankruptcy estates.

Order - 2

The Trustee has filed 54 adversary proceedings against investors seeking the return of what the Trustee contends are fraudulent conveyances. The action against the defendants herein is one of those actions. In these actions, the Trustee seeks to recover transfers avoidable under Chapter V of the Bankruptcy Code[1] as well as under Washington's Uniform Fraudulent Transfer Act, RCW 19.40.010 *et seq.* The complaint filed in this action alleges that from September 9, 2002, the defendants collectively made cash loans to one or more of the Meridian Funds in the total amount of $779,259, and that from October 1, 2007, through approximately November 27, 2009, they received total payments from the Meridian Funds in the amount of $1,133,129.11. Complaint, Dkt. #1, ¶¶ 27, 28. On the theory that the payments to the defendants were intentionally fraudulent transfers, the Trustee seeks to recover the full amount of those payments, $1,133,129.11, from the defendants. On the theory that the payments were constructively fraudulent transfers, the Trustee seeks to recover the excess of payments over loans in the amount of $353,870.11 as "Fictitious Interest." *Id.* at ¶29. The specific loans and payments referenced in the Complaint are shown in a table attached to the Complaint as Exhibit A.

## II. FACTS

Sun Granite has carefully crafted its Motion so that it pertains to only one loan, its $360,000 loan made to the Meridian Fund II ("Fund 2") on September 27, 2006, and one payment, the payment by Fund 2 to Sun Granite on October 1, 2007 in the amount of $408,073.62. With regard to those two transfers, the facts relevant to the Court's determination are not in dispute.

Sun Granite is a Washington Limited Liability Company whose majority members are

---

[1] Unless otherwise indicated, all Code, Chapter, Section and Rule references are to the Bankruptcy Code, 11 U.S.C. §§101 *et seq.* and to the Federal Rules of Bankruptcy Procedure, Rules 1001 *et seq.*

Order - 3

Lemoine and Foster Radford (the "Radfords"). Declaration of Lemoine Radford, Dkt. #70 ("Lemoine Decl."). On September 27, 2006, Sun Granite loaned Fund 2 $360,000 pursuant to the terms of a promissory note dated the same date (the "Note"). Pursuant to the terms of the Note, Fund 2 promised to pay interest to Sun Granite at the rate of 12.5% per annum and to repay the principal amount in full on or before the maturity date of September 30, 2007. Lemoine Decl., Ex. 1. Interest under the Note was to be paid monthly. *Id.* By letter dated August 30, 2007, Berg reminded the Radfords that the Note would mature on September 30, 2007 and asked whether they wanted to renew the Note or be repaid. *Id.*, Ex. 2. By letter dated August 30, 2007, Foster Radford responded by requesting repayment of the Note by wire transfer on October 1, 2007. *Id.*, Ex. 3. On that date, Fund 2 paid the principal and accrued interest under the Note by wire transfer in the amount of $408,073.62 (the "October 2007 Payment") in full satisfaction of its obligations under the Note.

On October 14, 2010, federal authorities charged Berg with money laundering and wire fraud.[2] Berg, in a plea agreement entered on August 2, 2011, admitted that he had knowingly and willfully devised and executed a scheme and artifice for the purpose of defrauding investors. Declaration of Heidi Garcia, Dkt. #75 ("Garcia Decl."), Ex. A. As part of the scheme, Berg "raised over $280 million from approximately 500 investors in his investment funds," while diverting "approximately $100 million that he used for his personal benefit and to promote the scheme to defraud."[3] On February 9, 2012, Berg was sentenced to 18 years of imprisonment, three years of supervised release, and restitution.[4]

---

[2] *United States v. Berg*, No. 2:10-cr-00310-RAJ (W.D. Wash. Oct. 14, 2010), Dkt. #4.

[3] The Trustee contends that Berg misstated both the number of investors in the Meridian Funds and the dollar amount of his fraud. *See* Plaintiff's Response to Motion, Dkt. 74, fn. 28.

[4] *United States v. Berg*, No. 2:10-cr-00310-RAJ (W.D. Wash. Feb. 9, 2012), Dkt. #95.

Order - 4

Since the filing of the Complaint, discovery has been stayed and the parties have engaged only in an exchange of initial documents pursuant to the Court's Scheduling Order at Dkt. #55 and the Pre-Trial Order at Dkt. 73 (*See* ¶7 related to the stay of discovery). Pending in the case is also defendants' Motion to Withdraw the Reference (Dkt. #12), which, together with the Trustee's Response (Dkt. 16), was transmitted to the District Court on September 18, 2012. Because the District Court has not ruled on the Motion to Withdraw the Reference, this Court may continue to hear and determine pretrial motions in this matter. Local Rule W.D. Wash. Bankr. 5011-1, 9015-1; Local Rule W.D. Wash. 87.

**III.  Issues**

Sun Granite has framed the two issues before the Court: (1) whether a borrower's payment of principal and a reasonable rate of interest due on an enforceable promissory note constitutes satisfaction of an antecedent debt within the meaning of Bankruptcy Code §548(d)(2)(A) and RCW 19.40.031(a); and (2) whether Sun Granite accepted the October 2007 Payment for value and in good faith within the meaning of Section §548(c) and RCW 19.40.081(a).

**IV.  Law**

   **A.  <u>Summary Judgment Standard.</u>**

To prevail on a motion for summary judgment, the moving party must show by reference to pleadings, discovery, admissions, and affidavits, if any, that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(a)(c), Fed.R.Civ.P.; Rule 7056, Fed.R.Bank.P. If the moving party meets its burden, the burden of production then shifts to the nonmoving party, who must produce by admissible

Order - 5

evidence "specific facts showing that there is a genuine issue for trial." Rule 7056(e). The moving party is entitled to a judgment as a matter of law if the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 91 L.Ed. 2d 265, 106 S.Ct. 2548 (1986). *See also In re Irizarry*, 171 B.R. 874 (9th Cir. BAP 1994).

### B.   The Trustee's Burden.

The Trustee, as plaintiff, has the burden of proving the elements of a fraudulent conveyance under federal and state law by a preponderance of the evidence. Neither party has briefed the elements the Trustee must prove because the Motion is based solely on the Sun Granite's defenses. Consequently, the Court can assume, for purposes of the Motion, that the elements of a fraudulent conveyance under both state and federal law have been met.[5]

### C.   The Statutory Framework.

The Trustee's fraudulent conveyance claims arise under federal law, Section 548(a)(1), and the state law Uniform Fraudulent Transfer Act, RCW 19.40.041. The only significant difference between these two statutes is the statute of limitations: the federal statute captures fraudulent transfers made within two years before the petition date and the state statute allows recovery within four years after the transfer is made. RCW 19.40.091.[6]

Section 548(a)(1) gives the Trustee an avenue for recovery of an intentionally fraudulent transfer [§548(a)(1)(A)] and a constructively fraudulent transfer [§548(a)(1)(B)]. The Complaint

---

[5] It should be noted that Berg's plea agreement, wherein he pled guilty to criminal offenses and admitted he was running a Ponzi scheme that defrauded the investors in the Meridian Funds, likely satisfies the Trustee's burden of proving intentional fraud under Section 548(a)(1)(A) and the companion state statute, RCW 19.40.041(a)(1). *Slatkin v. Neilson (In re Slatkin)*, 525 F.3d 805 (9th Cir. 2008). The Ninth Circuit Court of Appeals held in *Slatkin* that a Ponzi scheme operator's plea agreement is admissible under Federal Rule of Evidence 807 and that a guilty plea conclusively establishes the debtor's fraudulent intent under Section 548(a)(1)(A).

[6] The Court noted in oral argument that the transfer to Sun Granite at issue appears to have occurred outside the two-year statute of limitation under Section 548(a)(1), however, the parties have urged the Court to draw upon both state and federal law in resolving the issues in the case because of the similarities in the statutory framework.

Order - 6

alleges both theories of recovery. A transfer that is intentionally fraudulent is avoidable by the Trustee regardless of whether the transferee received "reasonably equivalent value" in exchange, subject to the transferee's defense under Section 548(c), discussed in the next section. A constructively fraudulent transfer, on the other hand, is not avoidable unless the transferee failed to give reasonably equivalent value to the debtor in exchange and unless one of the four conditions of Section 548(a)(1)(B)(ii) are met (dealing with insolvency and insufficient capitalization).

The state statutory framework is similar to Section 548. Under RCW 19.40.041, a transfer may be recovered if it was made by the debtor with actual intent to hinder, delay or defraud a creditor (subsection (a)(1)), or if it was made without receiving reasonably equivalent value in exchange for the transfer and where the debtor had or was left with insufficient assets to pay debts as they became due (subsection (a)(2)). Unlike its federal counterpart, however, an intentionally fraudulent transfer may not be avoided as against a transferee who took in good faith and for a reasonably equivalent value. RCW 19.40.081.

With the foregoing federal and state statutory framework for avoidance of fraudulent conveyances in mind, the Court turns to the defenses raised by Sun Granite which are found in Section 548(c) and RCW 19.40.081(d).

**D.    Sun Granite's Defenses.**

Sun Granite has the burden of proving its defenses by a preponderance of the evidence. The defenses asserted by Sun Granite, under both federal and state law, can be used whether the Trustee's theory for avoidance is based upon either intentional or constructive fraud.

Under Section 548(c) a transferee of an avoidable fraudulent transfer "that takes for value and in good faith…may retain any interest transferred…to the extent that such transferee…gave

Order - 7

value to the debtor in exchange for such transfer…." "Value" is defined in Section 548(d)(2)(A) to include the satisfaction of a present or antecedent debt of the debtor.

As noted above, the defenses afforded a transferee under the state statute operate slightly differently. First, a transferee can prevent the avoidance of the transfer in the first instance, whether the transfer is alleged to be intentionally or constructively fraudulent, by demonstrating that he took the transfer in good faith and in exchange for reasonably equivalent value. RCW 19.40.041(a)(2)(constructive fraud); RCW 19.40.081(a)(intentional fraud). In addition, if a transfer is avoided, a good faith transferee may nonetheless retain the transfer to the extent of any "value" given to the debtor.[7] Like its federal counterpart, RCW 19.40.031(a) defines "value" to include a transfer in exchange for the satisfaction of an antecedent debt.

### 1. Whether Fund 2's payment of principal and interest on the Note constitutes "value", *i.e.*, satisfaction of an antecedent debt.

Sun Granite's first line of defense is that because the October 2007 Payment constituted repayment of interest and principal in satisfaction of Fund 2's obligation to Sun Granite under a legally enforceable promissory note, the full amount of that payment constitutes "value" under both federal and state law. The Trustee disagrees and argues that under binding Ninth Circuit authorities, only transfers from Fund 2 which represent repayment of principal under the Note ($360,000) constitute value and that the Trustee may recover any transfer in excess of that amount, *i.e.*, the "fictitious interest" paid by Fund 2 ($48,073.62). The Court agrees with the Trustee that Ninth Circuit authorities permit Sun Granite to retain only the amount of its principal repayment so long as it took the payment in good faith, as discussed below.

The case of *In re United Energy Corp.*, 944 F.2d 589, 596 (9th Cir. 1991) is a good

---
[7] Sun Granite relies solely on RCW 19.40.081(a), which this Court believes applies to the voidability of the transfer in the first instance; the Court believes, however, that Sun Granite may also rely on RCW 19.40.081(d) in the event the transfer to it is avoided under RCW 19.40.041.

Order - 8

starting point for the analysis.  In *United Energy*, the trustee sought to recover payments made by the debtor (United Energy) to investors who had purchased solar energy production "modules" from the debtor and signed contracts to sell the power produced by the modules to a corporation related to the debtor, Renewable Power Corporation ("RPC").  The problem with the deal was that the modules never produced any power.  Instead, payments made to existing investors were based upon false invoices created by the debtor and RPC, and lacking any real source of income, the debtor paid existing investors from monies invested by new investors until the Ponzi scheme collapsed and the debtor was forced into bankruptcy.  The court's definition of a Ponzi scheme should be noted:

> A Ponzi scheme is a fraudulent arrangement in which an entity makes payments to investors from monies obtained from later investors rather than from any 'profits' of the underlying business venture.  The fraud consists of funneling proceeds received from new investors to previous investors in the guise of profits from the alleged business venture, thereby cultivating an illusion that a legitimate profitmaking business opportunity exists and inducing further investment.

*Id.*, fn. 1 (citing *Cunningham v. Brown*, 265 U.S. 1, 7-8, 44 S.Ct. 424, 425, 68 L.Ed. 873 (1924); *Hayes v. Palm Seedlings Partners-A (In re Agricultural Research and Technology Group, Inc.)*, 916 F.2d 528, 531 (9th Cir. 1990)).  In *United Energy*, the trustee sought to recover the power payments made to investors as constructive fraudulent conveyances under both federal and California law.[8]  Although the court did not address the defense in Section 548(c), it considered whether the investors had given "value" in order to determine whether the transfer could be avoided under the "reasonably equivalent value" standard for constructive fraud, specifically,

---

[8] For clarity, it should be noted that the court in *United Energy* was applying a prior version of Section 548; under that version of the statute, intentional fraud was provided for under Section 548(a)(1) [now Section 548(a)(1)(A)] and constructive fraud was provided for under Section 548(a)(2) [now Section 548(a)(1)(B)].  Other than the statutory designation, however, the content of the statutes then and now is in relevant part the same.

Order - 9

whether the power payments satisfied an antecedent debt of the investors. Considering the definition of "claim" under Section 101 of the Bankruptcy Code, the court concluded that the payments satisfied the investors' claims for "restitution" of the amounts of their investments and therefore qualified as "value" in the form of satisfaction of antecedent debt. While recognizing that "if the power payments are not set aside, earlier investors who received these payments will enjoy an advantage over later investors sucked into the Ponzi scheme who were not so lucky," the court nevertheless concluded that because no investor received an excess of power payments over the amount of his or her investment, reasonably equivalent value had been exchanged such that the transfers were not avoidable as constructively fraudulent transfers.

Sun Granite contends that *United Energy* ends the analysis. Clearly, however, it does not, for the court there noted in a footnote that the case did not involve investors who received more from the debtor than the amounts they invested. "Such excess amounts would be avoidable because the debtor would not have received reasonably equivalent value for them." *United Energy*, 944 F.2d at 595, fn. 6. One of the cases referred to in the footnote is *Rafoth v. Bailey (In re Baker & Getty Fin. Servs., Inc.)*, 88 B.R. 792 (Bankr. N.D. Ohio 1988). In that case, the court held that the trustee could recover fictitious "profits" paid to investors pursuant to stock purchase contracts with the debtor which promised a share of profits on the sale of large blocks of common stock. The court concluded that amounts paid by the debtor in excess of the investors' principal investments did not constitute reasonably equivalent value for purposes of the fraudulent conveyance analysis under both federal and state fraudulent conveyance statutes. *Baker & Getty*, 88 B.R. at 795-96.

The court in *Baker & Getty* relied on *In re Independent Clearing House Co.*, 41 B.R. 985, 999 (Bankr. D. Utah 1985), a case with facts more relevant to the facts in the instant case. In

Order - 10

*Independent Clearing House*, the investors, referred to in the investment contracts as "undertakers," invested a specific sum of money for a period of nine months. The funds were to be paid into a trust which would assume and pay at a discount the accounts payable of a related entity, Accounting Services Company ("ASC"). ASC was supposed to be in the business of providing management consulting and accounting services to client companies. The trust was to make a profit by receiving repayment from the client companies in excess of the discounted sums paid, and the profits ultimately distributed to the undertakers. Each undertaker could elect to receive revenues or "earnings" in fixed monthly payments over the nine month investment period or in a lump sum at the end of the period. In defense of the trustee's fraudulent conveyance claims, the undertakers argued that the earnings they were paid constituted "value" because the debtor had the undertaker's principal loan amount over a period of time. The court had no trouble concluding that the undertakers gave value in exchange for the repayment of their principal advances, in the form of repayment of antecedent debts created when they advanced funds to the debtor, however, the court rejected the undertaker's "time value of money" argument as to the "earnings," which were equivalent to a legal rate of interest for the use of the money. Instead, the court concluded that "the use of investors' money to perpetuate a Ponzi scheme is not the type of 'property' and hence 'value' Congress had in mind when it passed section [548(a)(1)(B)]." *In re Independent Clearing House Co.*, 77 B.R. 843, 859 (D. Utah 1987). The court concluded that the use of the undertakers' money over time merely permitted the debtor to "defraud more people of more money." *Id. See also In re International Loan Network, Inc.*, 160 B.R. 1 (Bankr. Dist. D.C. 1993).

Subsequent to these cases, two decisions were issued by other courts taking a different approach to interest repayments. In the first case, *In re Unified Commercial Capital, Inc.*, 260

Order - 11

B.R. 343 (Bankr. W.D. N.Y. 2001), the debtor was engaged in selling "debentures" and "certificates of deposits" which guaranteed to investors returns of 12% per annum. When the debtor became unable to repay those sums, however, it resorted to using new investors' monies to make those payments. The court found the debtor was engaged in a Ponzi scheme and addressed the question whether the debtor's repayment of the 12% interest could be recovered by the trustee as a fraudulent conveyance. The court rejected *Independent Clearing House* and other cases adopting its rationale, and instead concluded that payments by the debtor of interest pursuant to enforceable contracts did constitute satisfaction of an antecedent debt and therefore value, preventing recovery of those payments as fraudulent transfers. The second case, *In re Carrozzella & Richardson*, 286 B.R. 480 (D. Conn. 2002), reached the same conclusion. Acknowledging that there was "a sharp split of authority on the issue of whether the payment of interest by a Ponzi scheme operator can ever constitute reasonably equivalent value," the court concluded that interest payments ranging from 8% to 15% per annum paid to investors in a Ponzi scheme could not be recovered as fraudulent transfers where the investors took those payments in good faith. *Id.* at 487.

The next major case in the Ninth Circuit, issued in the context of the continuing debate over recovery of interest payments as fraudulent transfers, was *Donell v. Kowell*, 533 F.3d 762 (9th Cir. 2008). *Donell* stems from a massive Ponzi scheme perpetrated by J.T. Wallenbrock & Associates ("Wallenbrock"). Pursuant to this scheme, Wallenbrock sold notes to investors contending that the notes were secured by accounts receivable owed to Malaysian latex glove manufacturers. Wallenbrock told investors that their cash would be used to provide working capital to these manufacturers through Wallenbrock's purchase of the accounts receivable at a significant discount. When Wallenbrock collected the accounts receivable from the glove buyers

Order - 12

within 90 days after shipment of the gloves, it promised to return to the investors their investment plus a 20% return. Unfortunately for the investors, Wallenbrock took their money and used it to pay off earlier investors, to pay personal expenses, and to invest in risky start-up companies. When the scheme collapsed, the Securities and Exchange Commission brought a civil enforcement action against Wallenbrock, alleging that it was engaged in an unlawful scheme to sell unregistered securities. Although Wallenbrock argued that the investments were "notes" the court held that the investments were "securities" within the meaning of the Securities Act. *SEC v. J.T. Wallenbrock*, 313 F.3d 532 (9th Cir. 2002). Wallenbrock was subsequently placed in a receivership and the receiver, James Donell, filed actions against Robert Kowell and other investors seeking to recover "profits" paid to them by Wallenbrock under the California Uniform Fraudulent Conveyance Act. Relying on *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995), the Ninth Circuit stated the general rule that when innocent investors receive payments in excess of the amounts of their principal investment, those payments are avoidable as fraudulent payments. *Donell*, 533 F.3d at 770. Drawing from language in its earlier *United Energy* decision, the court reiterated the proposition that investors who are "winners," in that they receive all of their principal investment plus an additional return, should not be permitted to enjoy that advantage over later investors who were not so lucky and who did not enjoy such a return. *Id.*. The court then engaged in a lengthy discussion of the theories adopted by courts allowing recovery from investors in Ponzi schemes.

The *Donell* decision articulates four rules which are critical to the analysis in this adversary proceeding: (1) that to determine the liability of an investor in a Ponzi scheme, the so-called "netting rule" is used; (2) if the application of the netting rule shows that the investor received a positive return on the investment, the investor is liable under the fraudulent

Order - 13

conveyance statute for any amount received in excess of the investor's principal investment, regardless of whether the investor received payments in good faith and regardless of whether the fraud is found to be intentional or constructive; (3) where the Ponzi scheme involves intentional fraud on the part of the operator, an investor who lacks good faith has potential liability for all amounts received, including any repayments of the principal investment amount; and (4) once the avoidable transfers have been identified, the court has discretion to award prejudgment interest against the investor from the date the transfer was made. 533 F.3d at 771-73.

Sun Granite contends that because *Donell* did not specifically address whether the interest paid constituted "value" in the form of payment of an antecedent debt, the decision is not binding on this Court and the Court should instead follow the *Unified Commercial* and *Carrozzella* cases. *Donell*, however, cannot be so easily distinguished. Although the court held in a related case that the notes issued to the Wallenbrock investors were securities, fundamentally, the form of the investment at issue in the Wallenbrock scheme was a note with a set interest rate.[9] Further, the court specifically referenced the interest as "regular" and at no time as unlawful, and it acknowledged the harsh result:

> We are aware that it may create a significant hardship when an innocent investor such as Kowell is informed that he must disgorge profits he earned innocently, often years after the money has been received and spent. Nevertheless, courts have long held that is [sic] more equitable to attempt to distribute all recoverable assets among the defrauded investors who did not recover their initial investments rather than to allow the losses to rest where they fell.

*Donell*, 533 F.3d at 776. Although Sun Granite attempts to distinguish *Donell* because the

---

[9] As the SEC pointed out in its brief in the related case, *SEC v. J.T. Wallenbrock*, 313 F.3d 532 (9th Cir. 2002), under the statutes at issue, all "notes" are defined to be securities. Brief of the Securities and Exchange Commission, Appellee, 2002 WL 32102736, at *19; Securities Exchange Act of 1934, Section 3(a)(10)("The term 'security' means any note…"). The United States Supreme Court, however, has held that Congress did not intend that all "notes" be "securities" under that act. *Reeves v. Ernst & Young*, 494 U.S. 56, 61 (1990). Thus, the fact that the SEC determined the notes in Wallenbrock to be securities does not mean that in form, they were not promissory notes just like the notes at issue here.

Order - 14

interest rate was 20% as opposed to 12.5% provided for in the Sun Granite Note, there is nothing in the opinion to suggest that a higher or lower rate of interest would have any impact on the court's holding.

Sun Granite argues that to invalidate the interest paid to it by Fund 2 pursuant to a legally binding promissory note is against public policy. Under Washington law, Sun Granite contends, an entity that signs a promissory note is liable on the note. RCW 62A.3-401. The trustee's right to recover fraudulent transfers under state and federal law, however, does not run afoul of the public policy of permitting enforcement of valid contracts any more than preference laws run afoul of such policy. Sun Granite's Note has not been rendered unenforceable – instead, under state and federal fraudulent conveyance laws, Sun Granite is required to disgorge payments it has received in the interest of a more equitable distribution of the debtor's assets among the larger group of its creditors. On this point, the *Donell* court said "[t]he purpose [of the Uniform Fraudulent Transfer Act] is not to identify binding agreements, but to identify transfers made with no rational purpose except to avoid creditors." 533 F.3d at 777. Finally, although the court did not specifically address a transferee's right under Section 548(c) to retain transferred property to the extent it gave value, this Court is satisfied that *Donell* stands for the proposition that interest (the time value of the investor's money advanced to a Ponzi scheme operator) would not constitute "value" in the form of the satisfaction of an antecedent debt under Section 548(d)(2)(A). "Once Kowell has regained his initial 'investment,' he is no longer a creditor-his claim has been repaid. The other victims who did not receive payments in excess of the initial amount they were fraudulently induced to put into the scheme are the 'creditors' that UFTA protects." *Id.*, at 775. *See also In re Hedged-Investments Associates, Inc.*, 84 F.3d 1286, 1289 (10th Cir. 1996)(recipient of transfer from debtor engaged in Ponzi scheme has no "claim" other

Order - 15

than a claim for restitution of the amount invested).

Sun Granite worries that a broad rule invalidating any transfer to a creditor of a Ponzi scheme operator can be taken to an illogical extreme, for example, putting lenders under lines of credit, service providers and landlords of the debtor in danger of a fraudulent conveyance attack. In fact, there are already published cases dealing with transfers made to service providers by debtors operating a Ponzi scheme. *See, e.g., In re International Loan Network, Inc.*, 160 B.R. 1, 15 (Bankr. Dist. D.C. 1993)("These defendants were not like secretaries, lawyers and other employees or independent contractors: such workers did not invest money in the debtor's pyramid scheme before they were entitled to compensation. Such workers looked solely to their services performed as the basis for compensation. The investors, in contrast, first had to invest money in the pyramid scheme before they could get the compensation promised."); *In re Universal Clearing House Co.*, 60 B.R. 985 (D. Utah 1986)(commissioned salespersons who marketed the Ponzi investments entitled to payment of their commissions). Sun Granite, however, is not a service provider, so what rule should be applied to service providers and other creditors is not before the Court.

Although the debate in the courts continues over whether a defendant such as Sun Granite can retain interest payments made in connection with an investment in what turns out to be a Ponzi scheme,[10] under existing Ninth Circuit authorities, the Court finds that payments to Sun Granite in excess of its principal loan to Fund 2 are not supported by "value" such that Sun Granite is entitled to retain those amounts. Under *Donell*, the amount of the excess is calculated by treating the earliest payments received by Sun Granite as the repayment of its claim for

---

[10] *See* Plaintiff's Notice of Supplemental Authority (Dkt. #83), attaching *Janvey v. Alguire, et al.*, No. 3:09-cv-00724-N-BL, *24 (N.D. Tex. Jan. 22, 2013), Dkt. #909 (court summarizes case law and sides with those courts concluding that interest payments, even those at a reasonable and lawful rate of interest, do not constitute "value" in satisfaction of an antecedent debt).

Order - 16

restitution and the later payments after payment in full of the principal amount of the loan as recoverable fraudulent transfers to the extent they were made during the applicable statute of limitations. 533 F.3d at 774. Under this analysis, the October 2007 Payment overpaid Sun Granite's principal loan ($360,000) by $48,073.62.[11]

### 2. Whether Sun Granite accepted the October 2007 Payment in good faith.

The Court finds that because discovery has been stayed, it would be unfair to consider the second issue raised in the Motion, whether Sun Granite accepted the October 2007 Payment in good faith. Although the multiple orders on initial disclosures may have created some confusion, paragraph 7 of the Pre-Trial Order at Dkt. 73 clearly states that "until such time that the Court enters a final Discovery Order, all discovery is stayed." At the continued pretrial conference on January 29, 2013, the Court lifted the stay on all discovery proceedings.

Both parties acknowledge that *In re Agricultural Research and Technology Group, Inc. ("Agretech")*, 916 F.2d 528 (9th Cir. 1990) states the basic test for determining whether a defendant received a fraudulent transfer in good faith. The defendant bears the burden of proof on this question. Under *Agretech*, the test for good faith is objective, requiring the court to look to "what the transferee objectively 'knew or should have known'" rather than "examining what the transferee actually knew from a subjective standpoint." 916 F.2d at 536. At the same time, however, the court in *Agretech* acknowledged that a lack of good faith is demonstrated by a "transferee who knows that a debtor is operating a Ponzi scheme." *Id.*, at 535 (quoting *In re Independent Clearing House*, 77 B.R. at 861). At a minimum, the Court concludes that the Trustee is entitled to take the depositions of Foster and Lemoine Radford.

---

[11] According to the table attached as Exhibit A to the Trustee's Response, Sun Granite made a subsequent loan to Fund 2 in the amount of $100,000 on October 16, 2008. Sun Granite, however, has chosen not to make that payment part of its Motion, therefore, the Court makes no finding as to how that additional advance might affect the calculation of the excess transfers under *Donell*.

Order - 17

# ORDER

NOW, THEREFORE, for the foregoing reasons, it is HEREBY ORDERED that the Motion is DENIED.

///END OF ORDER///